IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ROBIN R. POPP,**

      **Plaintiff,**

  v.                                    **Civil Action 2:15-cv-2977**
                                                **Judge James L. Graham**
                                                **Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL**
**SECURITY ADMINISTRATION,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Robin Popp filed this action under 42 U.S.C. §§ 405(g) and 1383(c) seeking review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's statement of errors be **OVERRULED**, and that judgment be entered in favor of the Commissioner.

    **I.   BACKGROUND**

        **A.  Prior Proceedings**

Plaintiff applied for benefits on January 9, 2013, alleging a disability onset date of July 1, 2008. (Doc. 10 at Tr. 50, PAGEID #: 103). Her application was denied initially on April 9, 2013 (*id.* at Tr. 61, PAGEID #: 114), and upon reconsideration on September 18, 2013 (*id.* at Tr. 88, PAGEID #: 141). Administrative Law Judge George Gaffaney (the "ALJ") held a hearing on May 19, 2014 (*id.* at Tr. 26, PAGEID #: 79), after which he denied benefits in a written decision on June 4, 2014. (*Id.* at Tr. 19, PAGEID #: 72). That decision became final when the Appeals Council denied review on September 8, 2015. (*Id.* at Tr. 1, PAGEID #: 54). Plaintiff now appeals. (Doc. 10 (administrative record); Doc. 18 (statement of errors); Doc. 21

(response)).

### B. Testimony at the Administrative Hearing

Plaintiff's counsel began the hearing by listing Plaintiff's "severe impairments" as "impairments of the lumbar spine, impairments of the cervical spine, osteoarthritis of the knees, obesity, and some mental health impairments that have been diagnosed by consultative exam." (Doc. 10 at 27, PAGEID #: 80). He explained further that Plaintiff had "been diagnosed with spondylolisthesis of L4 over L5 with some central and foraminal stenosis," and that an L4/L5 laminectomy and fusion" she "was to undergo" "in June of 2013" was postponed "due to a[n] infection on her leg." (*See id.* ("It has not been rescheduled because, in the interim, Ms. Popp lost her medical insurance.")). Regarding her knee pain, Plaintiff's counsel explained that Plaintiff has "a large horizontal cleavage tear" in her left meniscus, and a smaller, similar tear in her right meniscus. (*Id.* at 27–28, PAGEID #: 80–81).

Plaintiff's testimony followed her counsel's statements. At the time of the hearing, Plaintiff was 55 years old, 5'8" tall, weighed 260 pounds, and had an 11th-grade education. (*Id.* at Tr. 27, 29, PAGEID #: 80, 82). Prior to filing for disability benefits, she worked most recently as a security guard. (*Id.* at Tr. 29, PAGEID #: 82). She was forced to quit that job, however, because she "couldn't take all the walking up and down the steps" and the "sitting." (*Id.*). Specifically, according to Plaintiff's testimony, she is "unable to sit for very long" or "stand for very long," and can only walk about 50 feet at a time. (*Id.* at Tr. 30, PAGEID #: 83; *see id.* at Tr. 32–33, PAGEID #: 85–86 (Plaintiff testifying that she can stand for roughly ten minutes at a time and sit for thirty minutes at a time). Plaintiff told the ALJ that her back pain bothered her the most, testifying that she is in constant pain no matter what position she is in or

2

movements she makes. (*See id.* at Tr. 32, PAGEID #: 85). She continued: "[The pain] goes from my lower back down my right leg, and at times it causes my right leg to just kind of buckle under me." (*Id.*). Plaintiff testified that "[d]oing anything for a long period of time makes it worse." (*Id.*). According to Plaintiff, she was prepared to have surgery in the summer of 2013, but was unable to do so because she lost her insurance. (*See id.* at Tr. 34, PAGEID #: 87). Beyond that, she said she had not received any treatment for her lower back pain. (*See id.* at Tr. 33, PAGEID #: 86).

Plaintiff testified next regarding her neck pain. She told the ALJ her neck was stiff "about 50 percent of the time," which caused her to get "severe headaches." (*Id.* at Tr. 34, PAGEID #: 87). She further testified that her neck pain and headaches are occasionally bad enough that she has to go sit in a dark room by herself with no noise. (*See id.* at Tr. 34–35, PAGEID #: 87–88; *see id.* at Tr. 35, PAGEID #: 88 (Plaintiff testifying that she gets neck-related headaches "[a]t least a couple times a week)).

Regarding her daily routine, Plaintiff testified that she spends most of her days watching television, with an occasional trip to the porch to sit outside for a few minutes. (*See id.* at Tr. 36–37, PAGEID #: 89–90). Plaintiff's pains, according to her testimony, prevent her from showering every day. (*See id.* at Tr. 37, PAGEID #: 90). She said she was capable of loading the washer and dryer, although she was unable to transport the clothes to and from the washer and dryer. (*Id.*). In addition, Plaintiff testified that she is unable to drive and that her daughter does the grocery shopping. (*See id.* at Tr. 38, PAGEID #: 91 ("Because I -- there's been times where I've forgot where I was, what I was doing. I had to pull over and actually force myself to remember where I was or which way I was supposed to go . . . .)).

### C. Relevant Medical Background

Plaintiff saw Dr. Sudhir Dubey for a psychological evaluation on July 23, 2012, for the purpose of assessment only, with no treatment being recommended or provided. (Doc. 10, Tr. 236, PAGEID #: 289). Dr. Sudhir noted that Plaintiff drove herself to the appointment, her "hygiene and grooming were unremarkable," and her "[g]ait was unremarkable." (*Id.* at Tr. 237–38, PAGIEID #: 290–91). Plaintiff told Dr. Sudhir that her activities include socializing with her friends and family, "purchasing supplies as necessary, paying bills as necessary, deciding how to spend the day, having the ability to drive, [keeping up with] self-care, and managing a daily routine." (*Id.* at Tr. 239, PAGEID #: 292).

On August 23, 2012, Plaintiff presented to consultative examiner Dr. Judith Brown for "back and knee problems." (*Id.* at Tr. 244, PAGEID #: 297). Dr. Brown noted that "[t]he claimant ambulates with a normal gait, which is not unsteady, lurching or unpredictable. She does not require the use of an ambulatory aid. She appears stable at station and comfortable in the supine and sitting positions." (*Id.* at Tr. 245, PAGEID #: 298). There was no muscle weakness noted and her manual muscle testing appeared normal. (*Id.* at Tr. 248–49, PAGEID #: 301–02). Regarding Plaintiff's physical capacity for work, Dr. Brown indicated that Plaintiff's "ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and pulling heavy objects appears to be at least mildly affected by the findings noted." (*Id.* at Tr. 248, PAGEID #: 301). Dr. Brown ultimately found that Plaintiff "could probably perform light duty work." (*Id.*).

On that same day, Plaintiff had an x-ray of her left knee and lumbar spine. The x-ray showed "mild medial compartment osteoarthritis without acute body abnormality" in the knee,

4

and "mild degenerative changes in lower lumbar spine without acute body abnormality." (*Id.* at Tr. 261–62, PAGEID #: 314–15).

Plaintiff saw Dr. Frank Fumich on October 1, 2012, for lumbar and cervical pain. (*Id.* at Tr. 269, PAGEID #: 322). During a physical examination, Dr. Fumich noted Plaintiff had "intact strength" in her lower extremities and that her "knee and ankle range of motion were full." (*Id.* at Tr. 270, PAGEID #: 323). Upon review of Plaintiff's lumbar spine x-ray, Dr. Fumich noted "grade 1 spondylolisteseis seen on L4 over L5" and "significant cervical spondylosis of the level of C5-C6 with both anterior and posterior formation." (*Id.*). In order for Plaintiff to be pre-certified for an MRI, she was ordered to complete physical therapy for her neck and low back, and was see Dr. Fumich again on an as-needed basis if her symptoms persisted. (*Id.*).

Plaintiff saw Dr. William Sanko twice in October 2012 for knee pain. (*Id.* at Tr. 267, 272, PAGEID #: 320, 326). During one of those visits, Plaintiff described her knee problems as ongoing for approximately twenty years, with her only treatment being Ibuprofen and Tylenol. (*Id.* at Tr. 272, PAGEID #: 326). Dr. Sanko found "some mild patellofemoral crepitus with range of motion" with "a mildly positive patellar grind." (*Id.*). There was "positive medial joint line tenderness to palpitation" and some discomfort "with forward flexion of the knees." (*Id.*). Dr. Sanko noted that Plaintiff's x-rays showed "medial compartment mild to moderate joint space narrowing" and that the patellofemoral joints were well preserved. (*Id.* at Tr. 273, PAGEID #: 326).

During the second appointment in October, Dr. Sanko reviewed an MRI scan of both Plaintiff's knees and found it was consistent with a "large horizontal cleavage tear involving the posterior horn of her lateral meniscus" in the left knee and that the right knee had a "similar tear

5

but smaller." (*Id.* at Tr. 267, PAGEID #: 320). Arthroscopic intervention was discussed, and Dr. Sanko stated he believed "that, followed by physical therapy would most likely give [Plaintiff] the most relief." (*Id.*). The same MRI, interpreted by Dr. Susie Kim, also showed that the ACL, PCL, MCL, and lateral collateral ligament were all intact. (*Id.* at Tr. 275, PAGEID #: 328).

Plaintiff presented to Mary Rutan Hospital Physical Rehabilitation Center on October 22, 2012, for an initial physical therapy evaluation regarding her back pain. (*Id.* at Tr. 286, PAGEID #: 339). Plaintiff attended three sessions following her initial evaluation, cancelled four, did not show up to one, and was eventually discharged due to her inconsistent attendance. (*Id.* at Tr. 282, 288–97, PAGEID #: 335, 341–50). As such, Plaintiff's physical therapist was unable to "accurately evaluate [her] overall functional disability." (*Id.* at Tr. 282, PAGEID #: 335).

Plaintiff again saw Dr. Fumich on April 30, 2013, for her back pain. (*Id.* at Tr. 338, PAGEID #: 391). Dr. Fumich noted, incorrectly, that Plaintiff "went through physical therapy as prescribed," and that she returned to the office since her pain continued. (*Id.*). Dr. Fumich reviewed x-rays of Plaintiff's back, which showed "grade 1 spondylolisthesis of 6mm of L4 over L5" and "increased anterolistehsis to 8mm of L4 over L5 in flexion." (*Id.*). Dr. Fumich ordered an MRI based on his clinical suspicion of "severe spinal stenosis." (*Id.* at Tr. 339, PAGEID #: 392).

Plaintiff's MRI, interpreted by Dr. Jane Burk, revealed "L4-5 scant disc bulge and moderate facet arthropathy" and "multilevel low-grade facet arthroses and low-grade capsulosynovitis." (*Id.* at Tr. 348, PAGEID #: 401). Dr. Fumich, reviewed the MRI himself and opined that the scan "shows a grade 1 spondylolistheses and lumbar spinal stenosis of the L4 over L5 level." (*Id.* at Tr. 335, PAGEID #: 388). According to Dr. Fumich's notes, Plaintiff

6

stated she "wishe[d] to proceed with definitive surgical intervention" on her back. (*Id.*, Tr. 336, PAGEID #: 389). Specifically, Plaintiff was scheduled to undergo a lumbar laminectomy on June 19, 2013. (*Id.* at Tr. 385, PAGEID #: 438). Prior to surgery, however, skin lesions consistent with an infected pubic hair folliculitis was discovered on the left medial thigh and left buttock. (*Id.* at Tr. 387, PAGEID #: 440). Due to the high risk of wound infection the surgery was cancelled. (*Id.*).

On August 27, 2013, Plaintiff again saw Dr. Brown for a physical consultative examination regarding, among other things, her knee, back, and neck pain. (*Id.* at Tr. 413, PAGEID #: 466). Dr. Brown noted that Plaintiff "ambulates with a normal gait, which is not unsteady, lurching or unpredictable. The claimant carries a walker but does not seem to lean on it." (*Id.* at Tr. 414, PAGEID #: 467). An examination of Plaintiff's knees revealed tenderness over the lateral joint line but there was no "redness, warmth, selling, effusion, laxity or crepitus in either knee." (*Id.* at Tr. 415, PAGEID #: 467). In terms of Plaintiff's back, there was additional tenderness over L1-L5 and the straight leg raise test was limited in the supine position, but appeared normal and without pain in the sitting position bilaterally. (*Id.* at Tr. 416, PAGEID #: 469). Finally, Dr. Brown noted, consistent with her previous examination, that Plaintiff's "ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and pulling heavy objects appears to be at least mildly impaired by the findings noted." (*Id.* at Tr. 417, PAGEID #: 470).

### D. The ALJ's Decision

The ALJ found that Plaintiff suffered from the following severe impairments: degenerative disc disease, obesity, and depression. (Doc. 10, Tr. 13, PAGEID #: 66). The ALJ

also addressed Plaintiff's non-severe impairments, which included hypertension, right knee degenerative joint disease, and Plaintiff's headaches. (*Id.*). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (*Id.* at Tr. 13–15, PAGEID #: 66–68). As to Plaintiff's residual functional capacity ("RFC"), the ALJ stated:

> Through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) where the claimant lifted or carried 20 pounds occasionally and 10 pounds frequently, stood or walked for six of eight hours during the workday, and sat for six of eight hours during the workday. She could only occasionally climb stairs, stoop, kneel, crouch, and crawl. Her work is limited to simple, routine tasks (unskilled) with occasional changes in work setting, and occasional interactions with the public.

(*Id.* at Tr. 15, PAGEID #: 68). In making this determination, the ALJ considered the opinions and corresponding reports of consultative examiners Dr. Judith Brown, Dr. Cynthia Waggoner, Dr. Jennifer Swain, Dr. Sudhir Dubey, and Dr. Donald McIntire consultative examination reports. (*See id.* at Tr. 15–18, PAGEID #: 68–71). The ALJ also analyzed Plaintiff's medical treatment records. (*See id.*). In assessing Plaintiff's credibility, the ALJ highlighted Plaintiff's "inconsistent work history prior to her onset date," that Plaintiff was "noncompliant" with her physical therapy sessions, that she "takes only Tylenol and Ibuprofen for pain[] as opposed to more powerful narcotic medications," and that "the record is absent any outpatient psychiatry or counseling treatment" despite Plaintiff's allegation of depression. (*Id.* at Tr. 16, PAGEID #: 69).

Relying on these and other considerations, the ALJ ultimately concluded that, through Plaintiff's date of last insured, "there were jobs that existed in significant numbers in the national economy that the claimant could have performed." (*Id.* at 18, PAGEID #: 71). The ALJ therefore denied benefits. (*Id.*).

8

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

In her only assignment of error, Plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence. (Doc. 18 at 11-20). A claimant's RFC is the most that a claimant can do despite his or her limitations and impairments. 20 U.S.C. §§ 404.1545(a)(1). "In making this determination, the ALJ must consider all relevant evidence in the case record. This evidence includes medical records, opinions of treating physicians, and the claimant's own description of his limitations." *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 668 (6th Cir. 2009) (citations omitted). Reviewing courts "are to accord the ALJ's determinations of credibility great weight and deference." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th

9

Cir. 2003). In addition, review on this issue is "limited to evaluating whether or not the ALJ's explanations" in support of the RFC analysis "are reasonable and supported by substantial evidence in the record." *Id.* In other words, the question at this stage is not whether the Court would have come to the same conclusion as the ALJ, but whether substantial evidence supports the ALJ's RFC determination. *See Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015).

### A. Plaintiff's Arguments

Plaintiff identifies and criticizes eight premises on which the ALJ relied to find that the RFC rests at light work, and not sedentary work: (1) Plaintiff's good functioning during physical consultative examinations; (2) Lumbar spine imaging revealing only mild to moderate changes, and no stenosis or nerve root compression; (3) Plaintiff's noncompliance with physical therapy; (4) Plaintiff's generally benign physical examination findings; (5) the absence of discussion of surgery to the left knee; (6) the use of only Tylenol and ibuprofen to treat Plaintiff's pain; (7) Plaintiff's activities of daily living inconsistent with her allegations of more limited functioning; and (8) the opinions of Dr. Brown. (Doc. 18 at 12–13).

### 1. Good Functioning During Physical Consultative Examinations

In its decision, the ALJ noted that despite Plaintiff's alleged back and knee pain, she displayed "good functioning during her consultative examination." (Doc. 10, Tr. 15, PAGEID #: 68). In support, the ALJ explained that during two consultative examinations in August 2012 and August 2013, respectively, "the claimant walked with a normal gait." (*Id.* at Tr. 16, PAGEID #: 69). The record is replete with other such examples: Dr. Dubey noted in July 2012 that Plaintiff's "[g]ait was unremarkable" (*Id.* at Tr. 238, PAGEID #: 291); Dr. Brown noted in

more detail that Plaintiff "ambulates with a normal gait, which is not unsteady, lurching or unpredictable" and "does not require the use of an ambulatory aid" (*id.* at Tr. 245, PAGEID #: 298); and Dr. Fumich stated Plaintiff "presents to the office using no assistive devices for ambulation" and "has non-antalgic, non-antaxic gait." (*Id.* at Tr. 335, PAGEID #: 388).

Plaintiff, on the other hand, notes several different limitations found by various doctors who saw Plaintiff. However, the limitations mentioned included observations that Plaintiff had difficulty in straight leg raising bilaterally, difficulty standing on one leg, and decreased cervical spine range of motion. (Doc. 18, Tr. 17, PAGEID #:13–14). These so-called limitations did not change the fact that Plaintiff presented with good functioning during her examinations.

### 2. Lumbar Spine Imaging

In regards to Plaintiff's degenerative disc disease, the ALJ acknowledged that "the record showed mild to moderate spinal abnormalities" but it "did not affect the claimant's ability to walk or her strength." (Doc. 10, Tr. 15, PAGEID #: 68). Specifically, the ALJ discussed in detail the findings of a March 2012 lumbar x-ray, an October 2012 cervical x-ray, and a May 2013 lumbar MRI. (*See id.* ("A March 2012 lumbar x-ray showed that the claimant had mild degenerative changes at the L4-L5 and L5-S1 disc levels.")).

Plaintiff claims, however, that the ALJ "glosses over Dr. Fumich's interpretation" of the May 2013 MRI and offers no explanation for why he relies on other interpretations over Dr. Fumich's. (Doc. 18 at 14). To the contrary, the ALJ explained that in "May 2013, the claimant's orthopedist mentioned stenosis at the L4-L5 disc level, which was not depicted in the results of the MRI, or any other imaging in the record." (Doc. 10, Tr. 16, PAGEID #: 69). In fact, the doctor who interpreted Plaintiff's MRI made no mention of stenosis. (*See id.* at Tr. 348,

11

PAGEID #: 401).  Thus, the ALJ considered Dr. Fumich's interpretation but ultimately found it was inconsistent with the record as a whole.  *See* 20 C.F.R. § 404.1527 ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

### 3. Noncompliance With Physical Therapy

The ALJ explained that Plaintiff began physical therapy sessions for her back but was discharged for noncompliance, "attending only four out of nine sessions."  (Doc. 10, Tr. 16, PAGEID #: 69).  This fact was used by the ALJ in making a credibility determination.  (*Id.*). Plaintiff does not deny the ALJ's statement but instead argues that the ALJ failed to consider Plaintiff's reason for cancelling her physical therapy sessions.  (Doc. 18 at 15–16).  Specifically, Plaintiff argues that the ALJ failed to mention her agoraphobia diagnosis in addressing noncompliance and state that "on several of the occasions she missed appointments, Plaintiff cancelled because she did not have transportation to the office."  (*Id.* at 15).

First, there is no evidence in the record that Plaintiff's agoraphobia diagnosis was a contributing factor in her absence from physical therapy.  Second, Plaintiff missed five therapy sessions in the span of less than three weeks, only two of which can arguably be attributed to lack of transportation.  (*See* Doc. 10, Tr. 288–97, PAGEID #: 341–50).  Finally, it is entirely proper for an ALJ to rely on noncompliance with physical therapy as a factor in determining credibility and supporting a finding of "not disabled."  *See Zanders v. Comm'r of Social Sec.*, No. 1:13-cv-137, 2014 WL 272165, at *6 (S.D. Ohio Jan. 23, 2014); *Simpson v. Comm'r of Social Sec.*, No. 1:14-cv-801, 2016 WL 74420, at *11 (S.D. Ohio Jan. 6, 2016) (holding that because "[t]he record does not show that plaintiff followed through on her treating orthopedist's

12

suggestions despite her complaints of disabling pain" the ALJ was reasonable in discounting Plaintiff's complaints).

### 4. Generally Benign Physical Examination Findings

Plaintiff argues that "[c]ontrary to the ALJ's assertion that the record reflects predominantly normal physical examination findings, the record is replete with abnormal exam findings." (Doc. 18 at 16). While the ALJ's opinion did focus on the relatively normal physical examinations of Plaintiff, he also noted the numerous imaging studies done on Plaintiff and carefully analyzed the results. (*See* Doc. 10, Tr. 15–16, PAGEID #: 69–70). Moreover, the ALJ reasonably pointed out the "normal physical examination findings" to show that Plaintiff's physical condition did not necessarily reflect that of someone who is disabled. (*See id.* at Tr. 16, PAGEID #: 69) (The ALJ noted that "[e]xaminations in October 2012 and April 2013 showed no joint tenderness and claimant was neurologically normal")).

### 5. The Absence of Discussion of Surgery To The Left Knee

In discussing Plaintiff's knee condition, the ALJ stated that "[t]he claimant did not have any knee surgery or discussions related to setting up a knee surgery." (Doc. 10, Tr. 16, PAGEID #: 69). The ALJ also noted, however, that "[a]n October 2012 left knee MRI showed a lateral meniscus tear and intermediate chondromalacia," demonstrating that the ALJ had a firm grasp on Plaintiff's condition. (*Id.*). Plaintiff, on the other hand, argues that the "ALJ repeatedly minimizes the Plaintiff's left knee condition" and points to the fact that Dr. Sanko suggested arthroscopic surgery to the left knee on October 25, 2012. (Doc. 18 at 18). However, the ALJ never denied that Dr. Sanko and Plaintiff had discussed surgery. Instead, he was making the point that despite Plaintiff's contention of debilitating knee pain, surgery had not occurred, nor

13

been scheduled, despite discussing arthroscopic surgery in October 2012, well before the date of last insured.  This inconsistency was reasonably noted.

### 6. The Use of Only Tylenol And Ibuprofen To Treat Pain

In discussing Plaintiff's credibility, the ALJ noted that "the claimant reported that she takes Tylenol and Ibuprofen for pain, as opposed to more powerful narcotic medications." (Doc. 10, Tr. 16, PAGEID #: 69).  Plaintiff's only response is to point to the fact that she could have had surgery, and "this treatment is more substantial than treatment via narcotic pain medications." (Doc. 18 at 18).  However, the ALJ properly considered her treatment of over-the-counter medications under the Regulations in his evaluation of Plaintiff's credibility.  *Walters v. Comm'r of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("The regulations indicate that if disabling severity cannot be shown by objective medical evidence alone, the Commissioner will also consider other factors, such as daily activities and the type and dosage of medication taken."); *See also* 20 C.F.R. §404.1529(c)(v) (information regarding what medications or treatments a claimant uses to alleviate her symptoms is "an important indicator of the intensity and persistence of your symptoms" and overall credibility).  While this was certainly not a deciding factor for the ALJ, it was reasonable for him to consider it making a disability determination.

### 7. Activities Of Daily Living

In finding that Plaintiff's impairments were not disabling, the ALJ relied on the fact that she was "still able to perform a good amount of activities of daily living including watching television, paying bills, preparing simple meals, assisting with laundry, and shopping." (Doc. 10, Tr. 17, PAGEID #: 70).  This assessment was consistent with the record.  In her first

psychological consultative examination with Dr. Dubey in July 2012, Plaintiff reported "purchasing supplies as necessary, paying bills as necessary, deciding how to spend the day, having the ability to drive, [keeping up with] self-care, managing a daily routine" and stated she had the ability to drive. (*Id.* at Tr. 239, PAGEID #: 292). She also reported shopping at the grocery store, preparing food or meals three times a week and aiding her husband in doing the laundry. (*Id.* at Tr. 205–206, PAGEID #: 258–259).

Plaintiff alleges these daily activities are taken out of context and cites to portions of the record that indicate she has pain when she sleeps or showers. (Doc. 18 at 19). However, the Sixth Circuit has found that activities such as those reported by Plaintiff herself "can constitute substantial evidence in support of a finding that a claimant is not disabled." *Dyer v. Social Sec. Admin.*, 568 F. App'x 422, 427 (6th Cir. 2014) (Plaintiff reported, among other things, being able to take care of her personal hygiene, grooming, cooking, laundry, driving, shopping, and visiting with friends and family); *see also* 20 C.F.R. § 404.1529(c)(3)(i) (authorizing an ALJ to consider activities when evaluating pain and functional limitations); *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 392 (6th Cir.2004) (permitting an ALJ to consider daily activities such as housework and social activities in evaluating complaints of disabling pain). Accordingly, the ALJ was reasonable in considering Plaintiff's inconsistency in her reported daily activities.

### 8. The Opinions Of Dr. Brown

The ALJ accorded "great weight" to the opinion evidence of consultative examiner Dr. Judith Brown M.D., who found that the claimant could perform light work. (Doc. 10, Tr. 17, PAGEID #: 70). Dr. Brown's assessment, according to the ALJ, was "consistent with examination where the claimant ambulated with a normal gait and had other good functioning"

15

and "her findings [were] supported by lumbar imaging that did not show any nerve root compression or stenosis." (*Id.*). Moreover, her findings regarding Plaintiff's straight leg raising test were consistent with that of other evaluations. (*Id.* at Tr. 247, PAGEID #: 300).

Plaintiff counters that the great weight afforded to Dr. Brown is problematic because her references to chronic lower back pain, chronic neck pain, and chronic knee pain are too vague. (Doc. 18 at 19). Moreover, Plaintiff suggests Dr. Brown is not aware of "the substantial nature of [her] diagnoses." (*Id.* at 20). However, it appears from the record that Dr. Brown performed a thorough examination on Plaintiff both times she was seen and had a comprehensive understanding on Plaintiff's symptoms that was consistent with the record. (*See id.* at Tr. 244–260, 413–421 PAGEID #: 287–313, 466–474). Therefore, the ALJ acted reasonably when he assigned great weight to Dr. Brown's opinions. *Richardson v. Comm'r of Social Sec.*, 570 F. App'x 537, 538 (6th Cir. 2014) (holding that "the ALJ reasonably gave great weight to the opinion because [Doctor] fully explained the basis for his determination and his conclusions were consistent with other substantial evidence in the record").

## IV. CONCLUSION

Despite Plaintiff's assertions, the ALJ's opinion makes clear that his analysis was reasonable and supported by substantial evidence in the record. This Court finds that the ALJ considered all relevant evidence in the case record, including medical records, opinions of treating physicians, and Plaintiff's own description of her limitations. If anything, Plaintiff's arguments against eight of the ALJ's findings support the fact that the ALJ thoroughly analyzed the evidence to reach his RFC determination. Therefore, for the reasons stated, it is **RECOMMENDED** that Plaintiff's statement of errors be **OVERRULED**, and that judgment be

entered in favor of the Commissioner.

### **Procedure on Objections**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).  Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.

Date:  January 9, 2017                                  /s/ Kimberly A. Jolson
                                                       KIMBERLY A. JOLSON
                                                       UNITED STATES MAGISTRATE JUDGE